UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
BUNARITH TEP, Personal Representative   )
of the Estate of Justine Tep,           )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )      Civil Action No. 13-11887-LTS
                                        )
SOUTHCOAST HOSPITALS GROUP,             )
INC., et al.,                           )
                                        )
        Defendants.                     )
_____)

MEMORANDUM AND ORDER ON DEFENDANT SOUTHCOAST HOSPITALS
GROUP, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. NO. 47)

September 22, 2014

SOROKIN, J.

        Bunarith Tep, a widower, brought this action against Southcoast Hospitals Group, Inc.

("Southcoast") and other defendants involved in his wife's emergency medical care at the time

of her death. His complaint includes a claim against Southcoast pursuant to the Emergency

Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, which places

limits on when hospitals may transfer individuals presenting with emergency medical conditions.

Southcoast seeks partial summary judgment, contending its liability is limited to $20,000 under

the Massachusetts charitable immunity statute, Mass. Gen. Laws ch. 231, § 85K. Tep opposes

Southcoast's motion. The Court heard oral argument on September 18, 2014. For the following

reasons, Southcoast's motion is ALLOWED.

I.      BACKGROUND

        A.      Relevant Facts

        The facts material to the pending motion are straightforward and, the parties agree,

undisputed.  See Doc. No. 49; Doc. No. 54 at 1.[1]

        At the time of her death, Tep's wife was twenty-six years old and had a history of

primary pulmonary hypertension.[2]  Doc. No. 49 at ¶ 1.  She arrived at the emergency room at

Charlton Memorial Hospital in Fall River, Massachusetts on August 9, 2011 complaining of

shortness of breath and a cough.  Id.  Someone at Charlton decided Mrs. Tep should be

transferred to Tufts New England Medical Center, where her pulmonologist was located.  Id. at ¶

2.  After midnight on August 10, 2011, Mrs. Tep was placed in an ambulance to be taken to

Tufts.  Id. at ¶ 3.  Before arriving there, Mrs. Tep went into cardiac and respiratory arrest.  Id. at

¶ 4.  The ambulance diverted to Milton Hospital, where Mrs. Tep died.  Id. at ¶ 5.

        Charlton is one of three hospitals operated by Southcoast.  Id. at ¶ 8.  Before its merger

into Southcoast, Charlton "was incorporated for the charitable purposes of establishing,

operating and maintaining a hospital for the surgical and medical care and treatment of the sick

and injured."  Id. at ¶ 7.  Southcoast "is organized as a charitable corporation . . . and operated

exclusively for charitable, educational and scientific purposes, including maintaining and

---

        [1]Citations are to documents that are part of the docket and viewable via the Court's
electronic filing system.  Where page numbers are cited, references are to the numbering placed
at the top of each page by the electronic filing system.

        [2]Primary pulmonary hypertension "is a rare lung disease that leads to narrowing of the
blood vessels of the lungs," which "worsens over time and causes high blood pressure in these
blood vessels."  Am. Lung Ass'n, Primary Pulmonary Hypertension, http://www.lung.org/lung-
disease/primary-pulmonary-hypertension/ (last visited Sept. 18, 2014).

2

operating charitable hospitals," such as Charlton.  Id. at ¶ 8.

During the 2010-2011 fiscal year, Southcoast generated revenue that exceeded its

expenses by more than $46 million.  Doc. No. 54-2 at 1.  Charitable contributions and grants

constituted almost $13 million of its total revenue, which surpassed $650 million.  Id.  Eleven of

its officers received compensation of at least $200,000; one chief executive officer was paid

more than $1 million.  Id. at 7-8.  Southcoast's tax returns from that year reflect it performed a

host of medical services, including caring for "181,205 emergency room patients 24 hours a day

7 days a week regardless of ability to pay for such services."  Id. at 2.  It incurred expenses

related to patient financial assistance and unreimbursed Medicaid claims (more than $16

million), and care provided to Medicare patients (at a loss of more than $28 million).  Id. at 32-

33.

B.      Relevant Statutes

Often referred to as an "anti-dumping" law enacted in response to concerns that hospitals

were refusing treatment to uninsured patients with urgent medical problems, Ramos-Cruz v.

Centro Medico del Turabo, 642 F.3d 17, 18 (1st Cir. 2011), EMTALA requires hospitals to

either examine and treat patients presenting with emergency medical conditions, or to provide

for the transfer of such individuals to another appropriate facility, § 1395dd(b)(1).  Hospitals

may not transfer patients with unstable emergency medical conditions unless specific criteria are

satisfied. § 1395dd(c).  Under EMTALA's civil enforcement provision:

> Any individual who suffers personal harm as a direct result of a participating
> hospital's violation of a requirement of [EMTALA] may, in a civil action against
> the participating hospital, obtain ***those damages available for personal injury
> under the law of the State in which the hospital is located***, and such equitable
> relief as is appropriate.

3

§ 1395dd(d)(2)(A) (emphasis added). EMTALA "do[es] not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with" the federal statute. § 1395dd(f).

In Massachusetts, charitable organizations are not immune from tort suits, but their civil liability is limited pursuant to the following statute:

> It shall not constitute a defense to **any cause of action based on tort** brought against a corporation . . . that said corporation . . . is or at the time the cause of action arose was a charity; provided, that if **the tort** was committed in the course of **any activity carried on to accomplish directly the charitable purposes of such corporation** . . . , liability in any such cause of action shall not exceed the sum of twenty thousand dollars exclusive of interest and costs. Notwithstanding any other provision of this section, the liability of charitable corporations . . . shall not be subject to the limitations set forth in this section if the tort was committed in the course of activities primarily commercial in character even though carried on to obtain revenue to be used for charitable purposes.

Mass. Gen. Laws ch. 231, § 85K (2010) (emphasis added).[3]

Resolution of the pending motion turns on the interplay between EMTALA and § 85K.

II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); accord Barbour v. Dynamics Research Corp.,

---

[3]On November 4, 2012, the limitation contained in this provision was increased to $100,000. That change, however, does not apply retroactively to claims such as the one alleged here, which arose before the amendment took effect.

63 F.3d 32, 37 (1st Cir. 1995). The Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the Court must ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009).

"There must be sufficient evidence favoring the nonmoving party for a [factfinder] to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50. "Trialworthiness requires not only a 'genuine' issue but also an issue that involves a 'material' fact." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993). For a factual dispute to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Nat'l Amusements, Inc., 43 F.3d at 735 (internal citation omitted).

III.    DISCUSSION

In urging the Court to apply § 85K's limitation on damages against charitable organizations, Southcoast primarily relies on the statutory texts and a 2004 decision by another session of this Court applying the charitable cap to an EMTALA claim similar to Tep's. See Stewart v. Milford-Whitinsville Hosp., 349 F. Supp. 2d 68 (D. Mass. 2004) (Gorton, J.). In Stewart, the Court considered the same question presented here – whether § 85K limits the

damages available in an EMTALA claim against a hospital. Judge Gorton concluded that the limitation did apply, adopting Magistrate Judge Swartwood's recommended findings that the hospital was a charitable organization for purposes of § 85K, that providing medical care and treatment were within the scope of its charitable purposes, that an EMTALA claim is a tort action within the meaning of § 85K, and that EMTALA incorporates (rather than preempts) § 85K. See Doc. No. 48-7 at 14-22.

Tep concedes "that Southcoast has made out a prima facie case that it is a charitable organization," Doc. No. 54 at 1, but opposes summary judgment on two grounds. One is inconsistent with decisions of the Massachusetts appellate courts construing § 85K, and the other was rejected by Judge Gorton in Stewart. Neither warrants denying summary judgment here.

A.      Status as a Charitable Entity

First, Tep points to an unreported state trial court decision, Nascimento v. Harvard Cmty. Health Plan, No. 94-2534, 1997 Mass. Super. LEXIS 128 (Ma. Super. Ct. Apr. 14, 1997), and argues that reviewing "the way in which an organization disposes of its net revenues is an important task in determining whether the organization's activities are charitable or commercial." Doc. No. 54 at 5. He suggests that a "profitable entity like Southcoast" should not be considered a charitable organization for purposes of § 85K because only a small percentage of its substantial revenue comes from charitable contributions, and it compensates its executives generously. Id. at 4.

In Nascimento, Justice McHugh of the Superior Court declined to enter summary judgment in favor of a non-profit community health plan, finding that the record before him raised a genuine issue of material fact regarding the charitable nature of the organization, even

6

though "the activities from which the alleged tortious activities arose seem[ed] to be at the core

of [the health plan's] stated charitable purposes, i.e., provision of medical services to patients."

1997 Mass. Super. LEXIS 128 at *3.[4]  Tep has submitted evidence that Southcoast's aggregate

revenue during the year of his wife's death exceeded its aggregate expenses, arguing that these

facts render Southcoast's attempt "to insulate itself from responsibility" via § 85K

"inappropriate, unnecessary, and unfair."  Doc. No. 54 at 2.  According to Tep, "it would be

preferred to follow" Justice McHugh's analysis and deny summary judgment here.  Id. at 4.

　　Massachusetts caselaw applying § 85K, however, fails to support Tep's theory.  In fact,

the Supreme Judicial Court ("SJC") has squarely rejected Tep's theory and the reasoning

underlying the Nascimento decision, emphasizing that it is the purpose of an institution – not its

size or revenue source – which dictates whether the institution is charitable for § 85K purposes.

Conners v. Ne. Hosp. Corp., 789 N.E.2d 129, 133-34 (Mass. 2003).  Another session of this

Court has described Conners as holding "that the inquiry into whether an activity is primarily

commercial in nature cannot be separated from the inquiry into whether that activity

accomplishes directly the goals of the charity."  In re Bos. Reg'l Med. Ctr., 328 F. Supp. 2d 130,

154 (D. Mass. 2004) (Wolf, J.); see Conners, 789 N.E.2d at 136 ("Having determined, correctly,

that the hospital's activity challenged by Conners 'accomplished directly' the charitable

purposes of [the hospital], it was not necessary for the judge to consider whether those activities

were 'primarily commercial in character.'"); see also Missett v. Cardinal Cushing High Sch., 680

---

[4]As Southcoast points out in its reply brief, the health plan involved in Nascimento was
not a charitable community hospital, but an organization affiliated with Harvard Medical School
providing "prepaid comprehensive health services for a subscribing population," "almost
exclusively for fees."  Doc. No. 55 at 4 (quoting 1997 Mass. Super. LEXIS 128 at *1 n.1).

N.E.2d 563, 567 (Mass. App. Ct. 1997) (clarifying that "[i]n the context of § 85K, an activity is 'primarily commercial' only when it is 'entirely disconnected' from the charity's purposes").

Here, Southcoast's core charitable purpose is the provision of medical care to the sick and injured in the community, the very activity that gives rise to Tep's claim. As the SJC made plain in Conners, if the revenue-generating activity at issue accomplishes the purpose of the charity, the inquiry ends for purposes of § 85K. Id. Even Justice Ireland, whose concurrence in Conners Tep excerpts, agreed that the language of § 85K mandated a finding that the hospital in that case was a charitable entity. See id. at 138 (calling upon the legislature to revise the statute, which he described as "monetarily outdated" and perceived as disregarding "the evolving roles of traditionally charitable institutions").[5] Tep has made no showing that Southcoast's purpose "is to benefit a select few, rather than the wider community," or that the actions forming the basis for his EMTALA claim arose from "activity [that] is a money-making enterprise merely designed to keep the charity afloat." Conners, 789 N.E.2d at 134, 136.

As Justice Ireland understood, policy arguments such as those presented by Tep regarding the fairness of allowing § 85K to shield a large, profitable hospital from civil damages resulting from its own wrongdoing are more appropriately directed toward Massachusetts lawmakers (who are empowered to amend the statute at issue), not the state or federal courts (which are bound by the existing statutory language). See Derry v. St. Vincent Hosp., No. 97-1720, 2001 WL 171191, at *2 (Mass. Super. Ct. Jan. 17, 2001) ("Courts must construe statutes as they are written."). The Court simply may not, consistent with Massachusetts law, look

_____

[5]Indeed, since Conners was decided, the legislature has amended the statute and addressed Justice Ireland's first concern by raising the monetary limit. See Mass. Gen. Laws ch. 231, § 85K (eff. Nov. 4, 2012).

beyond Southcoast's organizational documents and the charitable purposes set forth therein to determine whether its revenue renders it a commercial, rather than a charitable, enterprise. Accordingly, Southcoast is entitled to a finding that it is a charitable organization within the scope of § 85K, as a matter of law.

> B.     Tortious Nature of the EMTALA Claim

Second, Tep contends that § 85K does not apply to this federal claim due to its statutory character. He suggests EMTALA "preempts" § 85K, Doc. No. 54 at 5, notwithstanding EMTALA's explicit language to the contrary and the well-reasoned decisions of both state and federal trial courts in Massachusetts finding no such preemption.

The viability of Tep's contention turns on whether an EMTALA claim is a "tort."[6] See § 85K (applying broadly to "any cause of action based on tort"). Although this issue has not been considered by either the Massachusetts appellate courts or the First Circuit, Justice Fecteau of the Superior Court and Judge Gorton of this Court have confronted the question, and both have determined an EMTALA claim sounds in tort. See Derry, 2011 WL 171191, at *4; Stewart, 349 F. Supp. 2d at 70-71. The SJC has described a tort as "a civil wrong (as distinguished from a crime), other than a breach of contract, for which . . . the law . . . provides a remedy," and noted "[a]ll torts share the elements of duty, breach of that duty, and damages arising from that breach." Ankiewicz v. Kinder, 563 N.E.2d 684, 686 (Mass. 1990) (quoting a treatise on tort law, and rejecting the proposition that statutorily created causes of action not found in the common law "categorically do not sound in tort"). Considering EMTALA in light of this definition,

---

[6]Tep does not dispute that the actions at issue here were "committed in the course of an[] activity carried on to accomplish directly the charitable purposes of" Southcoast, as required by § 85K.

Justice Fecteau concluded "the substantive quality of [an] EMTALA civil action clearly sounds in tort." Derry, 2011 WL 171191, at *4.

Judge Gorton reached the same conclusion in Stewart. After he adopted Magistrate Judge Swartwood's recommendation that § 85K applies to an EMTALA action, the plaintiff in Stewart petitioned "to certify the question of law to the SJC to determine whether the federal EMTALA statute is subject to . . . § 85K." 349 F. Supp. 2d at 70. Judge Gorton refused, concluding "it is reasonably clear how the SJC would decide the matter," because "the substantive quality of an EMTALA action sounds in tort as that term is defined by the SJC," and "Congress clearly did not intend for EMTALA to preempt any state law or local requirement." Id. at 70-71. Congress's intent in this regard is made plain in the explicit language of EMTALA, which both incorporates state law (by allowing for "those damages available for personal injury under the law of the State in which the hospital is located," § 1395dd(d)(2)(A)) and rules out preemption (unless state law requirements "directly conflict[] with" EMTALA, § 1395dd(f)). See also Power v. Arlington Hosp. Ass'n, 42 F.3d 851 (4th Cir. 1994) (concluding an EMTALA claim sounds in tort, and applying state damage limitations to an EMTALA action).

The decisions in Stewart, Derry, and Power are well-reasoned and are more persuasive than the cases cited by Tep. Tep suggests that Stewart and Derry are somehow undermined by Ayash v. Dana-Farber Cancer Institute, 822 N.E.2d 667 (Mass. 2005), a case subsequently decided by the SJC. Ayash involved the interplay between § 85K and a claim of unlawful retaliation in violation of Mass. Gen. Laws ch. 151B, § 4. See 822 N.E.2d at 686-88. The SJC concluded – as the First Circuit previously had determined – that Chapter 151B was "a comprehensive statute enacted to provide judicial and administrative remedies for destructive

10

acts of discrimination in the workplace," and that claims brought thereunder did not sound in tort.  Id.; see McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals, 140 F.3d 288, 307 (1st Cir. 1998) (finding Chapter 151B "creates rights that did not exist under the common law" and did not give rise to causes of action in tort).  In reaching this conclusion, the SJC observed that Chapter 151B contained explicit provisions addressing whether and how its requirements should apply to charitable organizations.  Ayash, 822 N.E.2d at 688.

The SJC has reached similar conclusions and rejected attempts to apply § 85K to claims arising under Chapter 93A, Linkage Corp. v. Trs. of Bos. Univ., 679 N.E.2d 191 (Mass. 1997), and state wiretapping laws, Birbiglia v. St. Vincent Hosp., Inc., 692 N.E.2d 9 (Mass. 1998), finding both types of claims arose from statutes creating broad new rights governing conduct that was not considered unlawful under the common law.

The same cannot fairly be said, however, about alleged violations of EMTALA.  Such claims involve harm allegedly flowing from a violation of a duty that, while statutorily created, plainly sounds in tort.  EMTALA obligates hospitals to provide adequate medical screenings, stabilize patients presenting with emergent conditions, and appropriately transfer such patients according to statutory requirements.  It permits those harmed by a hospital's breach of these duties to bring a civil suit to recover "those damages available for personal injury" under state law.  § 1395dd(d)(2)(A).  Such a suit – unlike one involving a retaliation or wiretapping claim – is akin to a personal injury action, and the remedy permitted by the statute is described in terms of common law tort damages.  Thus, regardless whether EMTALA imposes strict liability or requires a finding of negligence, an action brought thereunder constitutes a quintessential tort action.  The SJC's decision in Ayash does nothing to alter this conclusion.

11

Finally, Tep faults Southcoast for relying on non-binding decisions by Massachusetts state and federal trial courts (Derry and Stewart) and an appellate court opinion from another jurisdiction (Power), but goes on to urge the Court to base a decision in his favor on reasoning employed by federal trial courts in California and Missouri. See Doc. No. 54 at 6-7. The cases he cites from those courts are not instructive on the question presented here. Two trial judges in the Northern District of California determined more than fifteen years ago that EMTALA explicitly incorporated state damages laws, but that EMTALA damages were not limited by one specific state-law damages cap, the scope of which was explicitly limited to actions "for injury against a health care provider based on professional negligence." Cal. Civ. Code § 3333.2; see Jackson v. East Bay Hosp., 980 F. Supp. 1341 (N.D. Cal. 1997); Burrows v. Tedbud Cmty. Hosp. Dist., 188 F.R.D. 356 (N.D. Cal. 1997). Additionally, nearly two decades ago, trial judges in Missouri's federal courts held that state sovereign immunity statutes which presented complete bars to recovery against county hospitals directly conflicted with EMTALA and, as such, were preempted. See Etter v. Bd. of Trs. of N. Kan. City Hosp., No. 95-0624-CV-W-6, 1995 WL 634472 (W.D. Mo. Oct. 26, 1995); Helton v. Phelps Cnty. Reg'l Med. Ctr., 817 F. Supp. 789 (E.D. Mo. 1993).

Unlike the California damages cap, § 85K is not limited to claims "based on professional negligence"; it reaches "any cause of action based on tort." And unlike the hospital defendants in the Missouri cases, Southcoast is not claiming complete immunity from suit. Accordingly, neither pair of cases stands for the proposition that EMTALA "preempts" all state damage limitations, nor do they justify a finding that an EMTALA claim falls beyond the broad reach of § 85K.

12

Under the circumstances presented here, Southcoast has established that Tep's EMTALA claim sounds in tort, as a matter of law, and is within the scope of § 85K.

IV.    CONCLUSION

Because there is no genuine dispute about the charitable nature of Southcoast and its hospital for purposes of § 85K, or about whether Tep has alleged tortious conduct that arose in the course of an activity carried on to accomplish directly the charitable purposes of the hospital, Southcoast is entitled to a finding that § 85K limits its liability in this action to $20,000. Accordingly, Southcoast's motion for partial summary judgment is ALLOWED.

SO ORDERED.


 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge