UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                      )
BUNARITH TEP, Personal Representative )
of the Estate of Justine Tep,         )
                                      )
       Plaintiff,                     )
                                      )
v.                                    )   Civil Action No. 13-11887-LTS
                                      )
SOUTHCOAST HOSPITALS GROUP,           )
INC., et al.,                         )
                                      )
       Defendants.                    )
_____)

ORDER ON DEFENDANTS' JOINT MOTION FOR A PROTECTIVE ORDER (DOC. No. 63)

December 4, 2014

SOROKIN, J.

Bunarith Tep, a widower, has sued Southcoast Hospitals Group, Inc. ("Southcoast") and other defendants involved in his wife's emergency medical care at the time of her death. Count I of Tep's amended complaint alleges Southcoast violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, which restricts when hospitals may transfer individuals presenting with emergency medical conditions. Doc. No. 20 at 5-7.[1] Counts II through IX assert state-law negligence claims against the remaining defendants. Id. at 7-13. Fact discovery is ongoing. Southcoast and two other defendants seek a protective order preventing disclosure of seven items responsive to Tep's document requests, but which the moving defendants claim are privileged. Doc. No. 63. Tep opposes the motion, arguing the

---

[1] Citations are to documents that are part of the docket and viewable via the Court's electronic filing system. Where page numbers are cited, references are to the numbering placed at the top of each page by the electronic filing system.

privilege the defendants cite is inapplicable here.  Doc. No. 96.  For the reasons that follow, the motion is ALLOWED.

I.      BACKGROUND

Tep's wife arrived at the emergency room at Charlton Memorial Hospital in Fall River, Massachusetts on August 9, 2011 complaining of shortness of breath and a cough.  Doc. No. 81 at 2.  Following some initial tests and assessments, plans were made to transfer Mrs. Tep to Tufts New England Medical Center, where her pulmonologist was located.  Id.  During the ambulance ride to Tufts, Mrs. Tep went into cardiac and respiratory arrest and subsequently died.  Id.

During discovery, Tep served Southcoast with document requests seeking, among other things, "documents concerning the hospital's internal investigation pertaining to [Mrs. Tep]." Doc. No. 64-2 at 11.  With its responses, Southcoast produced a short privilege log, in which it listed seven documents or categories of documents that it claims are privileged under Massachusetts law.  See Doc. No. 64-3.  The items included in the privilege log are:

1.  Minutes from a meeting of Charlton's emergency department at which Mrs. Tep's case was reviewed by the physicians in attendance;

2.  A "root cause" analysis by a separate group of Southcoast personnel who conducted an internal review of Mrs. Tep's case;

3.  A flow chart created by the team performing the "root cause" analysis reflecting the major events that occurred from the time Mrs. Tep arrived at the hospital until she died hours later;

4.  A short E-mail chain among risk management administrators for Southcoast regarding interactions with emergency transport teams and actions to be taken as a result of the review of Mrs. Tep's case;

5.  Minutes from another emergency department meeting at Charlton that reflect a brief follow-up discussion of Mrs. Tep's case;

6.  A safety report submitted by Southcoast to a state agency regarding Mrs. Tep's

    case and the related internal reviews; and

  7. Credentialing files for hospital personnel involved in Mrs. Tep's case.

See id. These are the documents at issue in the pending motion.

  After considering the parties' written submissions, the Court reviewed the first six categories of documents in camera. See Doc. No. 102.

II. DISCUSSION

  A. Relevant Federal Rules and Privilege Statutes

  The Federal Rules of Civil Procedure permit discovery of "any nonprivileged matter that is relevant to a party's claim or defense" or is reasonably calculated to lead to admissible evidence. Fed. R. Civ. P. 26(b)(1). The Court's review of the documents confirms that they plainly fall within the broad scope of Rule 26 and are discoverable unless they are privileged.

  Under Massachusetts law, the "peer review privilege" protects from disclosure any proceedings, reports, and records of a medical peer review committee, as well as any additional documents or information prepared in order to comply with risk management or quality assurance programs established by the state. Mass. Gen. Laws ch. 111, §§ 204, 205. The "fundamental purpose" of such a privilege "is to promote quality health care" through careful and candid review of adverse medical events by a medical provider's peers. Krolikowski v. Univ. of Mass., 150 F. Supp. 2d 246, 249 (D. Mass. 2001).

  No peer review privilege exists in the Federal Rules of Evidence, nor does any federal statute create a privilege directly applicable here. Two acts of Congress, however, do touch on concepts of confidentiality surrounding peer reviews and the federal interest in promoting safe patient care by encouraging such reviews. The first – the Health Care Quality Improvement Act

of 1986 ("HCQIA"), 42 U.S.C. § 11111 et seq. – sought to "restrict the ability of incompetent physicians" to move to new states without disclosing "previous damaging . . . performance." § 11111(2). To that end, the HCQIA "extended qualified immunity from suit to medical professionals involved in a defined medical peer review process," but stopped short of "creat[ing] a federal evidentiary privilege for most documents produced during such reviews." Gargiulo v. Baystate Health, Inc., 826 F. Supp. 2d 323, 327 (D. Mass. 2011).

The second and more recent – the Patient Safety Quality Improvement Act of 2005 ("PSQIA"), 42 U.S.C. § 299b-21 et seq. – "tackled the larger problem of systemic weaknesses in the delivery of health care resulting in preventable adverse events." KD ex rel. Dieffenbach v. United States, 715 F. Supp. 2d 587, 595 (D. Del. 2010). To address the problem, the PSQIA "announce[d] a more general approval of the medical peer review process and more sweeping evidentiary protections for materials used therein." Id. Those evidentiary protections apply to information gathered or generated in connection with reports to specified "patient safety organizations."[2] Id. at 596.

B. Application of the State Privilege in Federal Court

Under the Federal Rules of Evidence, the basis for a federal court's jurisdiction over a case or claim impacts whether federal or state privilege law applies. See Fed. R. Evid. 501; Gargiulo, 826 F. Supp. 2d at 325. If federal jurisdiction is based on the parties' diversity of

---

[2]Pursuant to the PSQIA, all "patient safety work product" is protected from disclosure, including in federal civil proceedings. 42 U.S.C. § 299b-22(a). "Patient safety work product" includes "any data, reports, records, memoranda, analyses (such as root cause analyses), or written or oral statements" that are created by a medical provider for reporting to a patient safety organization, are reported to a patient safety organization, or constitute deliberations or analysis of a patient safety evaluation system. § 299b-21(7).

4

citizenship, state privilege law generally applies. Gargiulo, 826 F. Supp. 2d at 325. Where a federal question is presented, "federal common law" on privilege generally applies to both "the federal claims and pendent state law claims." Id. Neither the Supreme Court nor the First Circuit has resolved the question of how to apply competing privilege rules in cases presenting claims under both federal and state law. Id.; see Bennett v. Kent Cnty. Mem'l Hosp., 623 F. Supp. 2d 246, 252 (D.R.I. 2009). Other courts of appeals, however, "have uniformly determined" that it would be "unworkable" to apply different privilege rules to separate claims in the same case. Gargiulo, 826 F. Supp. 2d at 326. Those courts, along with other trial courts in this District, have therefore concluded that in such cases, "the federal rule favoring admissibility, rather than any state law privilege, is the controlling rule." Id. (quoting Wm. T. Thompson Co. v. Gen. Nutrition Corp., 671 F.2d 100, 104 (3d Cir. 1982), and collecting cases from other courts); see also KD, 715 F. Supp. 2d at 590 (noting the legislative history of Rule 501 supports such a rule).

Tep advances a federal claim under EMTALA, along with several pendent state-law negligence claims. The EMTALA claim appears to be both viable and at the heart of this case, as the substance of Tep's claims is that the defendants transported his late wife without properly assessing her condition and ensuring it was stable.[3] See Gargiulo, 826 F. Supp. 2d at 326 (refusing to apply state peer review privilege where both federal and state claims were viable); Bennett, 623 F. Supp. 2d at 254 (applying a state peer review privilege where "the essence of th[e] case [was] medical malpractice," rather than a violation of EMTALA). As such, federal

---

[3]Indeed, a review of Mrs. Tep's case by state and federal agencies apparently found EMTALA was violated here. See Doc. No. 96 at 4-7 (excerpting an agency report).

law controls claims of privilege. See Gargiulo, 826 F. Supp. 2d at 325-26.

Moreover, much of the evidence relevant to Tep's EMTALA claim is likely inextricably intertwined with evidence related to his negligence claims. Cf. Bennett, 623 F. Supp. 2d at 255 (finding the evidence in dispute was "irrelevant with respect to [the plaintiff's] EMTALA claim"). Indeed, the documents submitted for in camera review nearly all contain narratives or information regarding Mrs. Tep's assessments and her condition leading up to and at the time of her transfer.[4] Such documents are directly relevant to his EMTALA claim. Accordingly, the Massachusetts peer review privilege does not apply. See Gargiulo, 826 F. Supp. 2d at 326.

C. Recognition of a Federal Common Law Privilege

Southcoast alternatively advocates for recognition of a federal common law privilege equivalent to the protection Massachusetts law and the PSQIA afford peer review documents that fall within the purview of those statutes.[5] The Court is not aware of any decisions within the First Circuit recognizing a federal common law privilege for medical peer review materials.

---

[4]The E-mails described in paragraph 4 of the privilege log do not contain the same sort of narrative as the other documents submitted, but they reflect discussions about interactions between hospital staff and emergency transport representatives. That topic is arguably relevant to an EMTALA claim.
    The Court has not reviewed the credentialing files described in paragraph 7 of the privilege log, and those files were not meaningfully addressed by the parties in their briefs. Based on their inclusion in the privilege log and the defendants' reference to the peer review privilege as a basis for withholding them, the Court infers that they contain peer review records about Mrs. Tep's case and, thus, are likely relevant to the federal claim.
    In any event, under the reasoning outlined in Gargiulo to explain why federal law controls in a case such as this one – even with respect to pendent state claims – it is irrelevant for choice-of-privilege-law purposes whether the documents contain information relevant to Tep's federal claim, his state claims, or both. See 826 F. Supp. 2d at 325-26.

[5]The defendants concede that the documents at issue are not privileged pursuant to the PSQIA, because they were not linked to reports to a "patient safety organization" as that term is defined in the statute. See Doc. No. 64 at 10.

Indeed, "the balance of authority [nationwide] weighs against recognition." KD, 715 F. Supp. 2d at 592; see Krolikowski, 150 F. Supp. 2d at 248 ("Federal courts have been reluctant to adopt a peer review privilege into federal common law."). Nonetheless, after careful consideration of the parties' submissions, the public policy reflected in Massachusetts law and the PSQIA, and the specific circumstances presented here, the Court is satisfied that recognizing a medical peer review privilege in this case will "promote[] sufficiently important interests to outweigh the need for probative evidence." Trammel v. United States, 445 U.S. 40, 51 (1980).

The First Circuit has identified two pivotal questions for consideration when determining whether to recognize a state evidentiary privilege in the federal common law: first, would the relevant state courts recognize the privilege and apply it to the disputed materials?; and, second, is the privilege "intrinsically meritorious?" See In re Hampers, 651 F.2d 19, 22 (1st Cir. 1981). The first question presents little difficulty here. After reviewing the documents at issue, there is no question that the Massachusetts courts would view them as protected under the state "peer review privilege" statute.

The second question is a closer one. Courts generally evaluate four factors when conducting the second Hampers inquiry: 1) "whether the communications originate in a confidence that they will not be disclosed"; 2) "whether th[e] element of confidentiality is essential to the full and satisfactory maintenance of the relation between the parties"; 3) whether that relationship "is a vital one, which ought to be sedulously fostered"; and 4) "whether the injury that would inure to the relation by the disclosure of the communications would be greater than the benefit thereby gained for the correct disposal of litigation." Id. at 23 (internal citations and quotations omitted); accord Gargiulo, 826 F. Supp. 2d at 326-27. Only if each of these four

factors are answered in favor of the party invoking the privilege will the Hampers test be satisfied and the privilege recognized in federal common law. See Gargiulo, 826 F. Supp. 2d at 327.

The first three factors strongly favor the defendants here. Like every other state and the District of Columbia, Massachusetts protects the medical peer review process with a statutorily created evidentiary privilege. See KD, 715 F. Supp. 2d at 594. Under various circumstances, federal statutes protect that process as well. See Doc. No. 64 at 8 (citing statutes assuring confidentiality of medical records created for certain federal agencies). Such statutory privileges arise from a general understanding that "encouraging physician candidness by eliminating the fear that peer review information will be used against them in subsequent litigation" is essential to promoting patient health and safety. KD, 715 F. Supp. 2d at 594. As such, it appears beyond dispute – based on common sense and uniformly adopted public policy – that: 1) physician peer review materials and related risk assessment or root cause analyses are generated by individuals who operate under the reasonable assumption that such information will remain confidential; 2) the element of confidentiality is essential to promote medical peer review processes and maintain a focus on patient safety by encouraging frank assessments of adverse events and their causes; and 3) the peer review process plays a vital role in ensuring public safety and should be "sedulously fostered."

The fourth factor is more difficult; indeed, it is this prong of the Hampers analysis that has prevented other sessions of this Court from recognizing a peer review privilege. See, e.g., Gargiulo, 826 F. Supp. 2d at 326-27 (refusing to apply the privilege in an employment discrimination case). This final factor "essentially weighs the federal interest" generally

favoring disclosure "against the state interest" in the asserted privilege. Id. at 327. Here, however, this factor favors application of the privilege for three reasons.

First, courts considering peer review privilege claims have rendered decisions that turn, at least in part, on the nature of the federal claim presented in the action. For example, where the federal claim alleges malpractice via the Federal Tort Claims Act, courts generally have recognized the privilege, which exists primarily to address concerns arising from anticipated malpractice litigation. See, e.g., Francis v. United States, No. 09-4004, 2011 WL 2224509, at *6 (S.D.N.Y. May 31, 2011); cf. Bennett, 623 F. Supp. 2d at 255 (applying state peer review privilege malpractice was essence of action). Where the federal claim alleges something unrelated to malpractice, such as employment discrimination, courts have determined the privilege would undermine other important federal interests, such as rooting out invidious discrimination. See, e.g., Gargiulo, 826 F. Supp. 2d at 327 (declining to extend the privilege "beyond the malpractice context"); cf. KD, 715 F. Supp. 2d at 597 (distinguishing between federal interests at issue in malpractice action and civil rights or antitrust action).

Although not a federal malpractice law, see Reynolds v. MaineGeneral Health, 218 F.3d 78, 83 (1st Cir. 2000), EMTALA involves subject matter that is closely intertwined with patient care decisions. This is particularly true in the matter before the Court. Here, recognition of a medical peer review privilege would promote important federal interests in ensuring patient safety and preventing "patient dumping" by encouraging full and fair peer review of adverse events that arise as a result of potential EMTALA violations (i.e., failure to adequately assess a patient or stabilize her prior to transfer), without fear that such dialogue will be used in subsequent civil litigation.

Second, since Congress enacted the PSQIA, at least three federal courts have recognized some form of a medical peer review privilege under federal common law. See Sevilla v. United States, 852 F. Supp. 2d 1057, 1068-69 (N.D. Ill. 2012); Francis, 2011 WL 2224509, at *7; KD, 715 F. Supp. 2d at 592; but see Awwad v. Largo Med. Ctr., Inc., No. 11-1638, 2012 WL 1231982, at *1 (M.D. Fla. Apr. 12, 2012) (summarily dismissing the PSQIA as irrelevant and declining to recognize the privilege in an employment discrimination case). In doing so, these three courts have examined the legislative history of the PSQIA and construed it as signaling a "shift in congressional policy" aimed at providing broad protection for peer review work product in an effort to improve patient safety and quality of care.[6] See KD, 715 F. Supp. 2d at 596.

The reasoning in these cases is sound. Although the privilege created in the PSQIA does not apply directly, it supports creation of a federal common law privilege applicable in this action. The documents at issue are like the "patient safety work product" protected under the PSQIA, and they were generated during reviews and analyses that are tantamount to a "patient safety evaluation system" under the PSQIA. Had they been provided to a "patient safety organization" listed in the PSQIA, it appears they would be statutorily privileged. In light of that, "protecting otherwise confidential and evaluative materials resulting from this process would not substantially offend the federal policy announced in the PSQIA." Id. at 597.

Finally, the parties appear to agree that the facts necessary to develop Tep's EMTALA claim have been disclosed in other documents contained in the relevant medical files, as the

---

[6]The "shift" is vis a vis the HCQIA, in which Congress had not adopted such broad protections. The decision not to create a peer review privilege in the HCQIA previously had been cited by many courts as an indication of congressional disapproval of such privileges on the federal level. See, e.g., In re Admin. Subpoena, 400 F. Supp. 2d 386, 390-91 (D. Mass. 2005).

10

events central to Tep's EMTALA claim occurred outside the peer review process.  See Doc. No. 64 at 11; Doc. No. 96 at 1-7, 14-15 (recounting at length facts contained in the relevant medical records and records reflecting the results of state and federal agency reviews of the case, and admitting the documents might "duplicate information contained" in other discovery).  As such, Tep's ability to build his case is not "unnecessarily impeded" by recognition of the privilege here.  See KD, 715 F. Supp. 2d at 597-98.

Accordingly, the Court finds that the Hampers test is satisfied, and that recognition of a medical peer review privilege is appropriate in the context of this case.  Southcoast's motion for a protective order (Doc. No. 63) is, therefore, ALLOWED.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge